Today is Compass Productions versus Charter Communications, and we will hear from you all now. And have we, you've done all the testing, we know that Judge Calabresi can hear and- I am here and hear you, I hope you hear me. Yeah, and you're right here next to me in living color, so great. Mr. Newman. Yes, thank you very much, good morning. This is Jonathan Newman for the Appellant, Compass Productions International, LLC. May it please the court. Earlier today, I noticed we had, I think, one or two law school classes in here. The first thing you're taught in law school about summary judgment is that the court is not supposed to weigh the evidence. It is about issue finding, not issue determination.  But also, did it in a light most favorable to the moving party, Charter Communications, as opposed to the non-moving party, Compass Productions International, LLC. In the record, there was, what we submit, at least some evidence, and the standard is any evidence, but we submit- Yeah, I don't think the standard is any evidence. I think we're way past that since Celatex. The question is, what could a reasonable jury find? Is there enough evidence that a reasonable jury could find in your favor? Sure, and we submit that looking at the light, looking at the evidence in light most favorable to Compass, a reasonable jury could find that there was an agreement. What we have is essentially conflicting testimony between two principals. One, Alan Singer, was a principal. Counsel, even with that conflicting testimony, is there anything that suggests that there has been an actual agreement on fundamental terms? I've seen many of these New York cases which people have brought on essentially a contract to contract, and I've got to say, as I look at the record, yours has less evidence than most of the others that I've seen that have gotten nowhere. So, try to point to me why there is any real indication that the other side agreed to you with anything, rather than just receive what you sent them. Sure, Your Honor. So, the principal point, and I would state, I don't know if it's on this end or Your Honor's end. The Wi-Fi looked a little red. It was a little hard, but I'm pretty sure I heard the crux of the question. The main point of evidence that I could point to is in the record. It was an internal email from Mr. Alan Singer to the other people at charter. And what he says is, quote, I told him 120 days to launch would not be realistic post-close. Asked for a year post-close to do this, but suggested perhaps say commercially reasonable efforts when we rebrand no later than six months. That was the statement that they made internally. So- But that's about, that suggests that at a minimum the term, which there was testimony as a critical term in this business about how long it would take or when it should be done, was unsettled. There was no agreement on that. So, from Composite's perspective, there was an agreement on that because they were given a launch window. They were told that- Well, wait, but your man, I think your man is Ellie Singer, right? Yes, correct, Your Honor. He sends to Alan Singer something that says on the top proposal. He then has a series of internal communications on your side of the aisle saying when are we going to get the deal done? The closest, this is the closest we've come to a commitment to date. They're playing coy and they haven't really given anyone a commitment that they'll do a deal or what the timing would be. And the price clearly had not been agreed upon because the proposal that you sent had terms that are admittedly not terms that anyone agreed on. So with respect to the, it's kind of a compound question, I'll try to unpack it as best I can. With respect to the word proposal on top, so we pointed to the evidence in the record. The initial draft of this rate card, this was the first time my clients had done a rate card. The initial draft that they did did not contain the word proposal. That word comes in when they start copying over a format that they received from a friend in the industry. So the initial one that they- Counsel, what do you have from the other side that suggests that they have accepted any of these terms? You have things that you have said and you have things that you've talked about about yourself. And then you have silence from the other side. Silence does not amount to agreement. There are instances in which silence would amount to an agreement. And we respectfully submit that the emails, the back and forth and the internal email actually sync up very well. And we've argued that in the brief. And I'm down to two minutes. But I would say in response to the question, we have the post-merger documentation, which was not created in December 2015 at the time of these communications. It's created five, six months later, which references, at least potentially, they argue is only potential. We argue that it demonstrates that there had been agreed upon terms and agreement to launch. It references the proposed terms, the five cents per subscriber, references a gold tier for my client to be launched on their channels. That's not done in December. That's done five, six months later. So somebody at Charter, when they argue that this was just a proposal and maybe something they would consider, and they say we would never have considered it. Yet somebody had this in their mind for five, six months down the road to add this into their post-merger documentation. We also have a March 2016 internal memo to the CEO of Charter, Tom Rutledge, who is going to be talking to Frank Pallone, one of the members of Congress who had potential. I'd like to talk on self-counsel. Realistically, if you had done, I won't call it threatening, but suggesting that I love you and so on, that you might affect this merger unless they do certain things, and you send them things, isn't it perfectly reasonable on their part to keep you waiting so that you won't do what they don't want because you think that there's an attempt without giving you anything? Isn't that what you would expect somebody to do who didn't want to make the contract or wasn't at all sure and just wanted to avoid the harm that you would cause? Well, I think that goes precisely to our promissory estoppel claim, is that even if this court, and I'm down to ten seconds, I'll stop anytime the court wants me to, is that even if this court finds that a contract wasn't reached, there's at least a question of fact in the record of whether a promise was made to my client, to induce them not to act precisely to prevent the harm. Well, it's really the same question, though, whether they agreed to the terms or they promised what the district court said was either way, there is not sufficient evidence from which we could find a promise. So I don't know that the promissory estoppel thing helps you very much. If the issue is, did they actually say, we're going to do this, absolutely, and we've got some kind of agreement here, when maybe they didn't. But again, that goes to weighing of evidence and conflicting deposition testimony. The promise is made between parties on a phone. There's not going to- So, can I ask about, I'm still trying to figure out the substance of the promise, because I understand you're pointing to the December 22 internal email on the charter side, as evidence of an agreement as to the timing, and in particular, you're saying you're looking at the, I told him 120 days would not be realistic, asked for a year post-close to do this, but suggested perhaps say commercially reasonable efforts when we rebrand no later than six months. He did not like that either, apparently. That's the provision that you're looking at to say this, a jury could reasonably infer that they reached an agreement based on that statement. Yes, based on the words to do this. That he was saying we would do this, that is the agreement to do this, which is not limited to just the timing, it's to actually launch the channel, because that's the crux of the argument. Now the court did- So the agreement, so all we have from the other side, we have to have two sides. What would make this easy is, of course, if we had testimony from your side, where Ellie says, during that call, he suggested three to six months. Commercially reasonable, not no longer than six months, whatever the terms are, and I agree. That would make this easier, but instead we have a follow-up rate card proposing 120 days, and an explanation that, not that we talked about 120 days on the call, but then because you ruled out 30, 60, and 90, but you didn't keep going. You must have implicitly not ruled out 120 days, and when you didn't specifically contradict that in my proposed rate card that was labeled a proposal, that signals you accepted it. So this goes to a legal argument that we've addressed in the brief, which is that under New York law, after an oral acceptance of an agreement, a party is allowed to attempt to negotiate better terms. In this case, and as can be seen, this goes back to one of the questions asked earlier, there are internal emails on my client's side where they're really nervous because of the specific timing, because they wanted to lock down a timing. Now the question of whether or not a window is acceptable or not, our expert says it is standard in the industry, and their expert never really addressed that, so that's a conflict of experts. But even the email that you highlight is forwarding the communication from Ellie Singer, which doesn't say, thank you, we're delighted that we're in agreement that you're going to do a launch, and as per the few details we still need to nail down, here's what we think that is consistent with what we discussed. It's just as per our conversation yesterday, I'm sending a rate card that discussed points we touched on during our call. That's a, it doesn't sound like a guy who thinks he has a contract. I think there's a distinction between the way that judges and lawyers think that people talk or should talk, and the way that people talk in the real world. I don't think somebody has to write in an email after what started out as a really unpleasant conversation, starting with, oh, so your Jewish mafia is going to stop our merger, oh, let's get this shakedown over with, to end up having a pleasant conversation, and then following that up with a really legal email that says, here's our agreement, now you're stuck with- No, no, no, no, just thanks. It sounds like we're on the same page. Here's the last thing. I mean, as far as how people talk in the real world, I don't know that I'd be all that comfortable with a conversation that started the way you discussed, and then evolves into something that, maybe, and winds up being, well, perhaps we could do it this way. And none of that sounds to me like the way people make deals. But the perhaps language that the court is referring to was the internal charter side. Right, but you are relying on that. You're saying that this shows that in-house, they knew that they had made a promise, and they're in-house saying a perhaps. We're saying that the language that they used in-house was different than the language that was used on the call. And the language that was used on the call, and this is getting back to Judge Fabrice's question, was specifically intended to induce my client not to go to the FCC. My client had, thankfully- What's the evidence of the language used on the call, if it's not this internal email after the call? What are you relying on as the evidence of what was said on the call? It would be the conflicting testimony between Mr. Ellisinger and Mr. Allensinger, because neither side- The testimony that you said no to 13, 16, 90 days. We didn't specifically discuss 120, but after the fact, I assumed that 120 must be okay, since you didn't affirmatively rule it out. So that would be the lower bound. The upper bound, my client was never questioned about during his deposition testimony, and the only- And he never put in an affidavit, and he's not limited by what he was questioned by. He could put in an affidavit that said, on the call, this is what was said. We don't have that. Well, we didn't need it because it was an admission on their part, because their own internal email said that that's what he limited the upper bound to. But we don't need my client to argue with their own email, because we agree with their email. We agree that they put an upper bound of no more than six months after rebrand. So there's no need for my client to submit an affidavit on that fact, because that fact, I don't think, is under contention. What do we do with rate seems, first of all, this whole email is describing the Jewish Channel proposal. Yes. And that's Alan towards not, I mean, it's drawn from the rate card. And so we already are understanding that this internally mail that we're relying on to establish that there was an agreement is described by both parties as a proposal, and it says rate seems higher, meaning the rate in the rate card. He indicated a nickel, but maybe get there. Doesn't that suggest that we're still negotiating the price term as well? I would respectfully submit not, because the post-merger documentation also reflects a merger, and both sides agree that there were no conversations after that point. So their own post-merger documentation, five, six months down the road, reflects the five cents. Again, internally, they're saying things that are very different than what was said on the call, at least as testified to by my client. So there is, like I said, this is something that can go to the jury, and the jury can weigh in at the end of. Counsel, if we buy what you say, when there is no agreement on licensing fees, there's no agreement on programming, there's no agreement on most favorable nature, there's no agreement on anything, there's nothing in writing, can any person reasonably enter into conversations about making a deal with someone else without being subject to a suit that gets to a jury and whether the deal has been completed? You know, if people talk the way you do, maybe they do. I've never heard of it. But if we buy your argument, people have better stop talking before making a, about entering into a deal, because of your grounds, anything that is said by one side suggests that the other must have accepted it. Well, I think that taking that to its logical conclusion would then rule out any sort of oral agreement, because that could be true of any sort of oral agreement. We had our expert witness who testified and put in his expert report that it is standard in this industry- If you're talking about an oral agreement, the statement that also these agreements should be in writing and such agreements usually are, the statute of frauds may not apply if you're talking only about one year, but why would any reasonable person ever enter into an agreement that would be only one year rather than four or five years who could be subject to the statute of frauds? So, you know, even that way, I'm sorry. Yes, so we had our expert witness who testified, was deposed, put in his expert report. It is standard in this industry, in the telecommunications cable industry, for parties to reach oral handshakes that then get reduced later down the road in writing to more formal contracts. So we're not suggesting that that would be true in every case. In every case, parties can just say whatever they want and get to a jury. But in this case, we do have expert testimony that that is reasonable practice and custom in this industry. We do not have any sort of testimony from or affidavit or any sort of sworn statement from the other side's expert that that's incorrect. And so we're not suggesting that that's true in every case. But in this case, if the parties, in fact, reach the agreement that our side has testified that they did, then there would be an agreement and it could be reduced later in writing. And whether my client was inartful in what they sent afterwards due to their lack of knowledge, lack of experience, that's a question for the jury. And again, the jury may agree and the jury may say you have not put on enough. We agree with charter. They win. You lose. And that's fine. But my client should at least get that opportunity to submit it to a jury. Otherwise, like I said, then parties can never assert an oral agreement. It just wouldn't happen because the very nature of a telephone conversation, unless it's recorded by one side or the other, is that you're not going to have it documented. Well, you know, attest an affidavit from your client saying this is what was said in the call. That's enough to get you to the jury. Yes, well, we had the complaint was verified by my client. So I don't know. And that's that's what he put in the complaint. So I believe that that should suffice for an affidavit. Again, I have no conclusions about what the what the agreement was. But does the complaint say during the call this is what was said? Yes. Yes. And it was specifically verified by my client. It wasn't an unverified complaint. So with with that, I know I'm way over my time. Thank you very much, Your Honor. Thank you. Mr. Anderson. Thank you, Your Honor, and may it please the court, Devin Anderson from Kirkland and Ellis on behalf of the defendant, appellee charter communications. I think Judge Marrero, as he correctly recognized, the documents and testimony in this case tell a remarkably consistent story. The parties did not reach a meeting of the minds on all essential terms of a carriage agreement, nor was there a clear and unequivocal promise of carriage. If Compass didn't go to the FCC, whether on the December 21st call or thereafter, just look at what Compass did after the call. It repeatedly told anybody who would listen that it didn't have a commitment from charter. They said charter hadn't, quote, really given anybody a commitment that they'll do a deal or what the timing would be. End quote. That's a joint appendix to 19. It continued its lobbying efforts to put political pressure on on charter. One of the things I'm struggling with is on the one hand, I think it seems perfectly fair to hold the plaintiff who's got the burden of proof on this to undisputed evidence about things that they said. On the other hand, we're supposed to look at the record and the light most favorable to them. And it's an odd thing to say, and that means ignoring all the evidence about what we said. I mean, that's in Congress, but is that what we should be doing here? Is not considering all of the damning evidence about what they said because it undermines their claim if they can find a kernel of something somewhere that supports their claim? I don't think so, Your Honor. I think this court looks at the entirety of the record. And I think here it's a straightforward task because as Judge Marrero recognized, the documents and the testimony are all pointing in the same direction. It'd be one thing, Your Honor, if the documents and testimony are all pointing in different directions, right? That's when we're only going to be drawing the inferences in favor of the plaintiff. But here there's really only one set of reasonable inferences that can be drawn from the record and the testimony. And when we're talking about the components of a carriage agreement, right, here it's straightforward because it's undisputed that at least one of those components is the timing, the when of any launch of a new channel on the cable network, and also the finances. And on both of those, there was no evidence that a rational jury could point to to say, yes, there was a meeting of the minds on this essential term. I think you have to start with the launch timing, which Compass's CEO, Mr. Ellie Singer, testified was the most essential term. Every piece of evidence in this record, from the testimony about the December 21st call to the emails exchanged between the parties to Compass's and Charter's own internal correspondence after the fact, shows the same thing, there was no meeting of the minds on launch timing. I talked a little bit about at the beginning about Compass's own internal correspondence where they told everybody they didn't have a commitment from Charter. We don't have a commitment on launch timing. Mr. Ellie Singer testified, and this is at Joint Appendix 64, that they didn't have something that seemed rather important. They needed a launch date. Otherwise, in his words, Charter could wait until the cows come home to launch this channel. Literally the day after this call, on December 22nd, 2015, Compass is working to set up multiple meetings on Capitol Hill with members of Congress to continue this political pressure campaign. The testimony about the December 21st call, there were three periods of time that were discussed, 30, 60, 90. The testimony was very consistent between Ellie Singer and Alan Singer that all three of those were shot down. And then when the rate card comes across, it's proposed at 120 days. And then Compass itself immediately identifies that 120 days as something that they were just proposing because 30, 60, 90 had been discussed but had been rejected. And so, Your Honor, I think that the evidence here is remarkably uniform. I do want to come back to something that counsel for Compass pointed to, which was the post-merger documentation. I would encourage the court to look at that because that evidence, we think, directly supports our case. And you can find that at sealed appendix 499. There was a spreadsheet that Charter had to keep track of various programming issues after the merger. So one part of the spreadsheet kept track of what Charter was carrying. Another part of that spreadsheet kept track of what Time Warner Cable was carrying because they were going to have to merge the two. The Jewish Channel shows up in a portion of that spreadsheet called non-contractual considerations. Non-contractual considerations. Again, that's sealed appendix 499. You can also see at joint appendix 257, the emails about this, where Charter is specifically setting the Jewish Channel aside as an ask that came in during the merger program. So it is on the Charter side, not the Time Warner side, but then it's listed as an ask? Correct. Correct. So Time Warner Cable did have what's called an SVOD, subscription video on demand agreement with Compass. Charter didn't have anything. My question is a little different, and it is how far in equity are you permitted to go to keep somebody from lobbying in a way that you don't to suggest that you might make a deal? How far can you go before you're committed to do more? I think, Your Honor, I think at least in this case, I don't know that the court needs to draw any sort of lines because I don't think that there's any evidence that we sort of led them to stop their lobbying efforts. In fact, they continued them. Again, the day after the call, on December 22nd, Compass is beginning, they're setting up meetings on Capitol Hill. Look, they're continuing that lobbying effort. They work to get various members of Congress to sign a letter that went to Charter's CEO. And all of that activity is happening, again, after this call. This is the exact opposite of what you would expect from a company that just got a linear deal. You would think they would be ramping down and then focusing on building up their programming. But again, Compass did the opposite. They cut programming. They fired people. They downsized their offices. None of this, I think, is compatible with the actions of a company that just got a big agreement. I do want to talk about the statute of frauds because in some ways, Your Honor, I think that that is the most straightforward way to also affirm Judge Marrero here. This was a textbook case for the statute of frauds. The alleged agreement here, and I'll direct the court to paragraph 127 of the complaint, where Compass sets forward the components of the agreement, is that, quote, defendant Charter agreed to give plaintiff Compass five years of silver tier distribution for TJC, the Jewish channel, with an initial license fee of five cents per subscriber per month. That's the agreement they're here in court to enforce. By definition, an agreement for five years of carriage cannot be performed within one year. And so that brings this case squarely within the statute of frauds. There's no writing here that's subscribed to by Charter. And so as a matter of law, frankly, this case should have been dismissed at the pleading stage. But at the very least, it supplies, I think, a key basis for summary judgment in this case. I'll speak very briefly about the promissory estoppel claims, Your Honor. I think, as Judge Lynch recognized, I think this claim is not really distinct from the breach of contract claim and fails for many of the same reasons. There is no evidence that supports the promise, again, that Compass is seeking to enforce in its complaint. And I would direct the court to paragraph 147 of the complaint, where the promise sought to be enforced is an if-then promise. If Compass doesn't go to the FCC, then Charter will give it carriage at silver tier for a nickel with increasing amounts for five years. There's no evidence in the record, as Judge Marrero recognized, that such a promise was made. It didn't happen in the calls setting up between Charter's government affairs employee, Waldo McMillan, and Compass's government affairs representative, Howard Friedman. It didn't happen on the Allen Singer-Ellisinger call. The FCC was never mentioned. And so for these reasons, unless the court has other questions, we would ask the court to affirm. Thank you. Thank you. We'll hear rebuttal from Mr. Newman. Thank you very much, Your Honor, and I only have three minutes. I'll try to address the issues that are most important. With respect to the internal communications that were pointed to by the other side, so the non-Compass witness, Howard Friedman, who was deposed, he testified in his deposition testimony that what that was was, number one, they wouldn't give a commitment to a third party, that they wouldn't tell anybody about the agreement, and that all it was that Compass was trying to do was get a specific launch date. So, again, that's not inconsistent with the we have an agreement on a launch window. We'd love to have a specific date so we know when we have to do what we want to do. Instead of kind of being open-ended, when are you going to merge? Then we have some time after that, a couple of months after that, and we don't know when we need to be ready by. That's all they were attempting to do. With respect to the arguments that Compass continued to lobby, the other side is improperly conflating two things. The agreement was not to go to the FCC, and when they say that there's no evidence of that, that there are internal communications from Mr. Friedman to Ellie Singer, specifically relating to his call with Waldo McMillan, which the other side agreed to, that Waldo called up and said, don't go to the FCC, we'll put you in touch with Alan Singer. Yes, that's a little short of don't go to the FCC and we'll put your channel on. So according to my client's testimony in his deposition, he testified that Mr. Singer did discuss not going to the FCC. Mr. Singer denies that. So, again, this is conflicting deposition testimony between two witnesses about what was or wasn't said. But even assuming that we credit Mr. Alan Singer's testimony, that it wasn't said, what we have here is a corporation. This is not a case of Compass versus Waldo McMillan. This is not a case of Compass versus Alan Singer. Corporations exist through their representatives. So you have two people continuing one conversation. You have Waldo McMillan saying, don't go to the FCC, we'll set you up with Alan Singer. Alan Singer starts his conversation, let's get this shakedown over with. Is your Jewish mafia going to stop our merger? Comments that he agreed, that he admitted to. He was a little ashamed of them, but he admitted to saying them in his deposition testimony. And then it's premised, it's premised on, we'll give you this deal. And my client doesn't ever lobby the FCC. There was a document pointed out in Charter's brief essay, Sealed Appendix 413, where Compass's advisors were pushing them, go to the FCC. And Compass wouldn't do it because they believed that they had this commitment. We don't go to the FCC. Excuse me, I have two questions as you're running short on time. One is just mechanical. Is the complaint in the Joint Appendix? And if so, where? I don't know that offhand. I don't know if it is or is not. And then the other is you might want to address the statute of frauds because everything you're talking about now are things that you did talk about in the original argument. And, of course, you're entitled to return to it to rebut what was said by your adversary. But he did raise the statute of frauds, and you hadn't had a chance to talk about that the first time around. So I wanted to make sure you had a chance to address that issue. Thank you very much. With respect to the statute of frauds, and this was found by Judge Marrero in the lower court where he rejected the argument, the agreement here was to launch the channel. By everybody's agreement, that could have been done within one year. Statute of frauds is inapplicable. When they make reference to the five years, both sides, both Ellysinger and Allensinger in their depositions, agreed that there had been no discussion about five years. The five years came from the rate card, which is a writing, and if the court were to credit that rate card as a memorialization of the oral agreement, that would take it out of the statute of frauds. But the five years was based off of the expectation of COMPAS because the five years is a standard term in the industry. And in the brief, we pointed to their charter's own documents, which shows that they showed in their post-merger documents five years with escalators. So those provisions that were put in the rate card that both sides agreed had not been discussed, those were standard in the industry. Again, our expert testified that those would be standard terms in the industry that a party could reasonably. So you're agreeing that if there was a contract, it was a five-year contract? No. Oh, no, I'm sorry. I thought you were saying these are standard terms in the industry. Everyone would have understood it was five years. No. That's wrong. The five years is a standard term that exists in the industry. It is not the only term that exists in the industry. It was the reasonable expectation of my client based on their limited past experience with Time Warner as well as the writing that they sent to the other side that was not objected to. Allensinger ignored it. He did not push back on that. That's the writing that they sent that was the proposal that you're talking about? Yes, correct. There's no writing signed by the other side or agreed to by the other side that says five years? There is no writing signed by the other side that says five years. This was the reasonable- Counsel? Yes, Your Honor. If we were to agree with you and let you send this to a jury, what would we say to the jury that they should find what? That there was a contract? But what would be the terms of that contract? If we sent it to the jury, are we just having them come back and say, yeah, there was a contract, but we don't know the terms of it? No. What we would be asking them as are the appropriate damages in a breach of contract case, we would be asking them to award the reasonable expectations of the party. So if the jury- No, no. You are not answering my question. What is the contract that you say that we should ask the jury to find? The contract was that Charter agreed to launch my client's channel. And because they failed to do that, my client's channel- Without, regardless of terms, that they just agreed to launch the channel. A missing- Is that- Yes, yes. Yes, that would be the contract. And then, as the Court knows, missing terms, as long as they're not essential, can be filled in based on- It might be five years or one year or whatever. Yes, exactly. Whatever the length that the jury felt based on the hour, what we could show, they used- Whatever the jury felt that they might have contracted for, that's what we should let them find. Yes. Yes, correct. But we're not specifically saying that there was a five-year contract here. Just the opposite. We're saying that the agreement was we're going to launch your channel. The reasonable expectation of my client based on the email sent, as well as customer usage in the industry, their past experience with- Then that would be the five years, and that's what we would ask the jury to award. And it would be up to their determination, the damages or the province of the jury. I know I'm way over if the Court wants me to stop. Thank you very much. We appreciate it. Thank you very much. Thank you both for your arguments. We'll take this under advisement. Thank you. It's a decision. Thank you. That concludes today's arguments. If you want to call to- Close it. Court is adjourned. Thank you very much.